**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

CIVIL ACTION NO. 2:19-CV-92 (WOB-CJS)

JEFF RIECK                                                PLAINTIFF

VS.                    <u>MEMORANDUM OPINION AND ORDER</u>

COVINGTON HOUSING AUTHORITY, ET AL.                      DEFENDANTS

Plaintiff Jeff Rieck ("Plaintiff") brought this action against several defendants claiming the termination of his employment constituted both a breach of contract and an infringement of his First Amendment rights. (Doc. 17, Amended Comp.). The six remaining defendants, Housing Authority of Covington ("the HAC"), the HAC's Board of Commissioners, Joseph Meyer, Shawn Masters, Jennifer Holt, and Jennifer Rawers have moved for summary judgment as to the two claims. (Doc. 76). Having reviewed the parties' pleadings and considered the parties' oral argument, the Court now issues the following Memorandum Opinion and Order.

## I. BACKGROUND

Plaintiff Rieck was the executive director of the Housing Authority of Covington ("the HAC"), serving from June 16, 2014, until he was terminated on September 19, 2018. (Doc. 17 at ¶ 4).

1

The HAC employed Plaintiff under a five-year employment contract that would have run from June 16, 2014, to June 15, 2019. (Doc. 76-3, Rieck Employment Contract, at 2). The HAC's primary purpose is to provide and administer public housing and subsidized housing to low-income residents of Covington, Kentucky. (Doc. 87, Rieck Dep. at 50).

Plaintiff's term began when Sherry Carran was the mayor of Covington. (*See id.* at 87, ¶ 13). In 2016, Defendant Joseph Meyer defeated Carran in a general election and became the new mayor of Covington in 2017. (Doc. 76-1 at 2). A key feature of Meyer's mayoral platform was reforming the concentration of poverty and public housing in Covington, so the HAC would naturally be involved. (Doc. 81, Meyer Dep. at 15, ¶¶ 8-12). As mayor, Meyer automatically became one of the HAC's five Board members ex officio, replacing Carran. (*Id.* at 10, ¶¶ 23-25). These impending reforms would eventually lead to tension within the HAC.

Plaintiff's tension with Meyer began as soon as January 2017 when Meyer took office, about when Meyer told Plaintiff to "stop filling the units at City Heights," a dated public housing development in Covington, because "in eighteen months they [would] all be gone." (Doc. 87, at 48, ¶¶ 22-23). Plaintiff claims Meyer "got in [his] face" and "order[ed him] to stop filling units at City Heights" and to "basically get[] rid of people," testifying

2

that Meyer's tone came across as "a little bit abusing." (Doc. 78, at 61, ¶¶15-19; and 103, ¶¶ 18-19). One Board member allied with Plaintiff, Board Chair Jennifer Allen, agreed with Plaintiff's characterization of Meyer's attitude toward City Heights and public housing in general as "abusive," testifying that Meyer had referred to City Heights as a "cesspool." (Doc. 79, Allen Dep. at 38-39).

These interactions caused Plaintiff and Allen to become defensive of City Heights, among other HAC matters. Plaintiff expressed to Allen in one of several secret audio recordings that he would never cooperate with a decision to close City Heights without a corresponding public-housing redevelopment component. (*See id.* at 56 ¶¶ 6-11).[1] Plaintiff later admitted in testimony that the decision whether or not to close City Heights, and what housing alternatives would or would not be provided, were fundamentally matters of HAC Board policy, and not unilaterally controlled by the HAC's executive director. (*See* Doc. 87, at 18 ¶ 24).

From 2017 until early-2018, Plaintiff sought to have the HAC accept a $1 million grant from the City that had purportedly been committed to the HAC under the previous administration. (*See* Doc.

---

[1] Plaintiff began regularly recording interactions he had with coworkers and his superiors without their knowledge around mid-2016. He would not, or could not, give a specific reason in his deposition why he did this, but it is part of the record. (*See* Doc. 78, Rieck Dep. at 112-114).

78 at 87-89). On the second to last day of the Carran administration, Plaintiff invoiced the $1 million to the City of Covington. (*See id.*). When Plaintiff began to insist that the City was obligated to pay this purported grant, multiple legal and official authorities in the City were consulted to review whether the commitment of funds was legally binding. (Doc. 81 at 66). They unanimously found that it was not, that City officials did not have to provide the funds, and the Board refused to authorize a lawsuit by the HAC against the City. (*See id.* at 66, ¶¶ 1—18). The Board officially tabled the grant for final disapproval, precluding any further pursuit of the grant, but Plaintiff would continue to bring it up even in Board meetings, another sore point between him and Meyer. (*See id.*; Doc. 76-10, 7/9/17 Minutes).

Meyer also testified he became concerned about Plaintiff's job performance in the summer of 2017 when the HAC's finance department lost key personnel under Plaintiff's watch. Meyer also referred to a report filed by a finance department employee to HUD claiming "improprieties" by Plaintiff. (Doc. 81, at 17 ¶¶23-25). After that report, the finance director retired, and the assistant finance director resigned after Plaintiff refused him a promotion and raise. (Doc. 81 at 18-19). When this assistant director soon asked to withdraw his resignation and agreed to return to his position for the same pay he had worked for previously, Plaintiff refused to rehire him. (Doc. 81 at 18 ¶¶ 2-12). In late 2017, the

accounts-receivable staffer quit. (Doc. 76-41, 10/2/18 Email and HUD Report, at 2).

These resignations were a major setback for the HAC's already modest finance department. Only a staff accountant and a temporary finance staff member were left, so Meyer anticipated substantial accounting issues would arise. (*Id.* ¶¶ 9-12). As a solution, Plaintiff sought financial emergency consulting services from BDO USA, LLP, a private accounting firm. (Doc. 78, at 132 ¶¶ 2-16). Interestingly, Plaintiff had already been in contact with BDO for services as early as June 2017, even before the series of resignations from the finance department took place, presumably unbeknownst to the Board. (Doc. 78, at 130-31 ¶¶ 19-1).

At the next board meeting in July 2017, the Board authorized Plaintiff to enter into an agreement for services with BDO in an amount not to exceed an annual amount of $150,000. (*Id.* at 130 ¶¶ 2-6). By October 2017, just four months later, a BDO invoice showed costs had topped $150,000, which would reach $205,626.68 by December 2017. (*See* Doc. 76-15, BDO Costs). Plaintiff did not report these cost overruns until the end of the board meeting in December 2017, when the Board approved an "amendment" of $60,000 more to fund BDO for the next three months. (*See* Doc. 76-16, 12/20/17 Board Minutes (HAC 0469), at 5; Doc. 76-17, January 2018 Minutes (HAC 0473), at 3; Doc. 78, at 134-138 ¶¶ 19-8). This

$60,000 sum still did not cure the existing overrun of approximately $55,000, because, as mentioned, Plaintiff had not yet expressly acknowledged this issue to the Board. (*See* Doc. 76-16). This was additional funding.

At the January 2018 board meeting, an increase to the original $150,000 BDO contract amount was addressed by resolution. Prior to this meeting, Plaintiff revealed to Allen, though no other board member, that BDO was "basically [the HAC's] finance department." (MSJ RI 01-17-18 - Jenn Allen and NIP Conversation, 0:30-0:40). At the January 2018 board meeting, Plaintiff finally disclosed the BDO-contract funding shortfall and requested $150,000 on top of the $60,000 already given to him in December 2017. (*See* Doc. 76-17 (HAC 0473), at 3). Meyer took particular interest in this issue, asking Plaintiff for clarification that Plaintiff had so far asked for a total of $360,000 to close the gap left by three employees in the finance department, even though there were no apparent candidates for those positions. (*See id.*). The reasons Plaintiff cited for this shortfall were "difficulty in hiring HAC finance staff, finance salaries underfunded by HUD, nuances in HUD requirements, and how HAC is advertising job openings." (*See id.*).

At the next board meeting in February 2018, Plaintiff openly expressed his displeasure with comments Meyer had made regarding City Heights over a year prior in January 2017, that Plaintiff regarded the comments as demeaning to the HAC's residents and

6

contrary to the HAC's mission. (*See* Doc. 87, at 154-55, ¶¶ 16-1). Then, at the next Board meeting on March 21, 2018, a HAC staff member was given a platform, apparently by Plaintiff and Allen, to read a letter addressed to the Board from HAC staff expressing similar concerns that the staff was under supported and there was no commitment to the HAC's mission. (Doc. 78 at 58, ¶¶ 1-6; Doc. 81 at 27, ¶¶ 22-25).

The January 2018 and February 2018 meetings caused more tension between Plaintiff and Meyer. Plaintiff and Allen both specifically allege that Meyer once crushed a water bottle loudly during a meeting, wringing it noisily with his hands, that Meyer would get red in the face when presented with any sort of opposition, and that he would scoot his chair loudly so as to garner attention and passive-aggressively express his displeasure. (Doc. 78 at 19 ¶ 20-25; Doc. 79 at 40 ¶¶ 2-17). Plaintiff claimed that at least once Meyer looked at him in such a way that he felt physically threatened, although there was never physical contact between them. (Doc. 78, at 105 ¶4-9; Doc. 81, at 140 ¶¶13-19). In general, Plaintiff and Allen began to feel that Meyer's actions and demeanor created a hostile and combative work environment. (*See* Doc. 78, at 76 ¶¶; Doc. 79 at 40).

Conflict manifested further in April 2018 when Meyer told then-Board Chair Allen that he would run for her Chair seat, and

that he intended to appoint Shawn Masters to fill a recent vacancy on the HAC Board.[2] Meyer then appointed Masters, and the City Commission approved. Plaintiff and Allen asserted that Masters's appointment to the Board was unlawful under KRS § 80.040(2)(a), which at the time provided that "no more than two (2) appointees on any city housing authority shall be affiliated with the same political party." (Doc. 78, at 194 ¶¶ 20-21). With Masters's appointment, three board members were registered Democrats: Commissioners Jennifer Allen, Jennifer Holt, and Masters. (*See* Doc. 79, at 139 ¶¶ 20-22). Plaintiff and Allen had apparently already been aware that this issue may arise with Masters's appointment, but said nothing until the meeting when the appointment was confirmed.

When Allen raised this issue again at the next regular board meeting on May 16, 2018, Commissioner Holt left the room for a matter of minutes and returned to inform the Board that she was changing her party affiliation to "Independent," having used her phone to complete an online application to change party affiliation with the Kentucky Secretary of State. (Doc. 76-27, 5/16/18 Minutes; Doc. 76-28, 5/16/18 Email). While this created compliance with the statute, at least in the legal opinion of the Board's attorney Stephen McMurtry, Plaintiff and Allen insisted this had not cured

---

[2] The mayor of Covington appoints the HAC Board members when vacancies arise, and the City Commission approves the appointments if they wish.

the defect. And they regarded McMurtry's legal opinion as invalid because, in their view, he was simply acting as a political puppet of Meyer. (Doc. 78, at 78-79, ¶¶ 25-2). Allen then adjourned the meeting early. (*See* Doc. 76-27, 5/16/18 Minutes). Nonetheless, in a special meeting on May 23, 2018, with Plaintiff conspicuously absent and Allen leaving early after expressing her continued discomfort with the political composition of the new Board, the Board proceeded to conduct the meeting with a quorum of four board members. (*See* Doc. 29, 5/23/18 Minutes). McMurtry conducted board elections, and the Board elected Meyer as Board Chair and Masters as the Vice-Chair. (*See id.*).

Allen filed two complaints and requests for legal advice from the Kentucky Attorney General's Office (KOAG) and HUD's Office of Inspector General (OIG), insisting that the Board's decisions were illegitimate, both in general and with specific respect to the recent board election. Neither the KOAG nor the HUD OIG responded to Allen formally, although HUD directed Allen to "consult [the Board's] attorney." (Doc. 79, at 21 ¶¶ 2-10, 147 ¶¶ 4-7). McMurtry again expressed to Allen that it was his legal opinion that Holt's online application cured any defect under KRS § 80.040 and that if she insisted on a more definitive answer, it would have to come from a court. (*See* Doc. 76-31, 6/12/18 Email regarding McMurtry (HAC 0162)).

With Plaintiff and Allen continuing not to cooperate with the new Board, an injunction lawsuit was filed to compel their recognition of the legitimacy of the new constituent members of the Board and compliance with its directives. *City of Covington, Kentucky, et al. v. Housing Authority of Covington, et al.*, 18-CI-1128 (Kenton Cir. Ct. 2018). (*See* Doc. 3, 06/28/18 Order). On June 20, 2018, the Kenton Circuit Court ruled in agreement with Meyer's and McMurtry's position, at least provisionally, by granting a temporary restraining order after holding a hearing with the plaintiffs present. (*Id.*). The trial court ordered:

> Defendants Housing Authority of Covington, Commissioner Jen Allen, and all affiliated and related persons associated with the Housing Authority of Covington: to comply with Kentucky Revised Statutes and HAC by-laws, to acknowledge the appointment of recent members to the HAC Board, to acknowledge the composition of the current HAC Board, and to recognize the recent election of officers.

(*Id.*). Plaintiff continued to deny the validity of the Circuit Court order, citing his reason as a lack of "representation in court," since he was not present at the TRO hearing. (Doc. 78, at 214-15 ¶¶ 24-3).

Plaintiff and Allen continued in their recalcitrant stance. At the June 2018 Board meeting, Plaintiff and Allen were again absent, with Plaintiff basing his absence on Allen's unilateral approval of his annual leave without the approval or knowledge of other board members or of Board Chair Meyer. (*See* Doc. 35, 6/3/18

10

Email). Thus, the Board was unable to discuss at the meeting Plaintiff's intentions with respect to the HAC.

Still, two days later, on June 20, 2018, Plaintiff was told in a phone call with Stephen McMurtry that the Board wanted to continue working with him notwithstanding continuing "philosophical issues with [the Board's] approach to public housing. . .." (Doc. 85, Audio Recordings, "MSJ RI 06-22-18 - Steve M Conv Board" (01611690)). Plaintiff simply told McMurtry he could be reached at work and that the Board had his personal cell phone number if it wished to discuss his intentions with respect to the HAC. (*Id.*).

Meyer emailed Plaintiff expressing his disappointment in Plaintiff's response to McMurtry, and his impression that Plaintiff was being intentionally nonresponsive toward the Board. (Doc. 37, 6/26/18 Email). In response, Plaintiff insisted he could be reached at work, provided his personal cell number, and expressed a willingness to talk. However, Plaintiff's email opened:

> Well I would hope it would be a positive relationship fully in support of our mission and in ensuring our residents are served as well as provide hope to the nearly 1000 wait list applicants in our community hoping and praying for affordable housing.  It however takes all parties working together towards that goal though.

(*Id.*).

In July 2018, without the Board's approval, Plaintiff decided to issue an request for proposal ("RFP") for the position of the Board's counsel, a position McMurtry had held by contract. (Doc. 51, 7/11/2018 Email). It was fundamentally within the Board's discretion, not the executive director's, to issue an RFQ/RFP to renew or replace contracts over $20,000 in value, (Doc. 50, HAC Procurement Policy), a value McMurtry's contract exceeded. Plaintiff presumably knew this, but persisted as if he had the authority to choose not to renew McMurtry's contract.

Meyer and the HAC Board passed a resolution to suspend Plaintiff without pay and provided him with notice of their intent to terminate him in a letter dated July 18, 2018. (*Id.* at ¶¶ 27, 30). Steve Arlinghaus was named the Interim Executive Director of the HAC following Plaintiff's notice of termination. (Doc. 17 at ¶ 33). On September 19, 2018, the Board passed a resolution to officially terminate Plaintiff's employment. (*Id.* at ¶ 34). Plaintiff waived his post-termination hearing. (Doc. 40, Email from Torchia).

By October 2, 2018, Meyer had summarized the reasons for terminating Plaintiff in a HUD report addressing the HAC's management:

- "Rieck allowed emergency consulting services to morph into day-to-day operation of the Finance department without advising the board and spent in excess of his contractual authority under procurement policies.

12

- Rieck violated the procurement code by failure to establish with specificity the deliverables from the BDO contract.
- Rieck authorized and paid expenses well in excess of the amounts authorized by the board.
- Rieck failed to execute financial consulting services contracts before authorizing payments.
- Rieck failed to arrange for the employment and training of permanent finance department staff.
- Rieck failed to develop a plan to transition from BDO to HAC employees as directed by the board in April.
- Rieck tried to conceal from the board the amounts paid to BDO by moving payments from the general fund to the capital fund.
- Rieck used public resources for the benefit of private for-profit and not-for-profit entities in violation of Kentucky law."

(Doc. 41, 10/2/2018 Email and HUD Report). Other reasons are touched upon in the same report, including Plaintiff's seeking approval from Jen Allen for a directive to the finance department to credit him annual leave beyond what his contract allowed. Additionally, in a display of lack of transparency, Plaintiff refused to disclose his contract and salary information to the Board after Plaintiff had asked the Board for a merit raise and McMurtry had informed him the Board had a right to review such information. Also referenced were Plaintiff's absences and failure to prepare for Board meetings consistently and properly.

On July 17, 2019, Plaintiff filed his complaint against the defendants asserting three claims: (I) First Amendment retaliation; (II) interference with prospective employment; and

(III) defamation. (Doc. 1 at 8-10). On November 19, 2019, Plaintiff filed an amended complaint to add a claim for breach of contract in Count IV. (Doc. 17 at 10-11). Since then, as mentioned above, claims (II) and (III) have been dismissed, and former defendant McMurtry has been terminated from the case. (*See* Docs 32; 56).

## II.  ANALYSIS

### A. Standard of Law: Rule 56 Motion for Summary Judgment

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

### B. First Amendment Retaliation Claim under Section 1983

A state actor cannot condition employment on a basis that infringes an employee's constitutionally protected freedom of speech and expression under the First Amendment. *Connick v. Myers*, 461 U.S. 138, 142 (1983). To survive summary judgment as a public

employee asserting a Section 1983 First Amendment retaliation claim, Plaintiff must demonstrate that he can prove that (1) he engaged in protected conduct, (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct, and (3) the adverse action was taken at least in part because of the exercise of the protected conduct. *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005).

The scope of expressive freedom enjoyed by public employees is more limited than that enjoyed by a member of the public. *See Connick*, at 143. To determine whether a public employee's conduct or speech is protected, the Court must find (1) that his speech touched on matters of "public concern"; (2) that he spoke as a private citizen and not as an employee pursuant to his official duties; and (3) that his liberty interest in the speech outweighs the efficiency interests of the government agency. *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 462 (6th Cir. 2017). The factors considered in balancing the parties' competing interests under element three were established in *Pickering v. Bd. of Educ., 391 U.S. 563 (1968).*

The Court first must identify the speech Plaintiff claims was constitutionally protected. The Complaint here does not quote or specifically describe Plaintiff's speech. Rather, the Complaint describes Plaintiff's speech generally as "advocacy for public housing and the mission of HAC; [his position towards] the City's

15

failure to support public housing and the mission of HAC; and Plaintiff's opposition to Defendant Meyer's attempt to operate HAC in violation of the law and contrary to the mission of HAC." (Doc. 17 at ¶ 36).

Plaintiff's response to defendants' motion for summary judgment is more specific. First, Plaintiff expressly opposed what he regarded as the unlawful appointment of Shawn Masters to the HAC's Board, and Meyer's subsequent election to Board Chair under KRS § 80.040. (Doc. 94 at 22).

Second, Plaintiff openly criticized Meyer's "opposition to public housing and his failure to honor the mission of HAC," referring to Meyer's campaign platform as trying to "rid Covington of public housing." (*Id.*). Plaintiff expressed this opposition openly in early 2018 at board meetings, to which Meyer allegedly made a display of his displeasure and frustration by crushing water bottles, glaring, and scooting his chair loudly. (Doc. 78, at 104-05).

Third, Plaintiff perceived Meyer's participation on the Board as generally tyrannical, rendering the Board effectively a "Board of one," claiming further that somehow Meyer's participation constituted a "conflict of interest," given Meyer's decision not to pursue certain housing grants while he was a member of the HAC's Board. (Doc. 94, at 22).

16

Fourth, perceiving Meyer's directive to not fill any more units at City Heights as potentially violative of federal housing regulations and generally put off by Meyer's "threatening and retaliatory behavior towards [him] and HAC staff," Plaintiff reported Meyer to a City human resources director, Covington city officials, and HUD representatives in Louisville. (*Id.* at 23).

Fifth, regarding the new Board's policies as "potential discrimination" towards existing and prospective HAC residents, Plaintiff stated to Meyer that, ". . . it is suspect under your 'leadership' that anything positive or possibly even legal or nondiscriminatory will happen with public and affordable housing in Covington." (*Id.* (citing Meyer Dep. Ex. 18)).

This speech will be analyzed in two groups based on similar substance and manner of expression: (1) those statements concerning or related to alleged violations of KRS § 80.040, and (2) Plaintiff's criticisms of Board policy and related resistance to the Board. Before proceeding to that analysis, however, two simpler elements of the claim can be addressed.

It is not disputed that Plaintiff suffered an adverse employment action. Plaintiff was affirmatively terminated before the end of his contract term. And even though the defendants insisted in June 2018 that they wished to continue working with Plaintiff, and that may have been sincere, the weight of record evidence indicates that Meyer's and the Board's intention was to

17

keep Plaintiff as executive director until the end of his contract, at which time his contract would not be renewed. (Doc. 81, at 66 ¶¶ 13-20). Both termination and non-renewal of contracts constitute adverse employment actions in the context of a retaliation claim. *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 685 (1996); *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999).

As to the employer's motivation in taking adverse action, the third element, disputed motivations and other state-of-mind issues are questions of fact more properly resolved by a jury, not typically by the Court as a matter of law. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1437 (6th Cir. 1987). In retaliation cases specifically, the Sixth Circuit has recognized that an employer's true motivations are particularly difficult to ascertain, rendering them generally unsuitable for disposition by summary judgment. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

The defendants' motivations in terminating Plaintiff are reasonably disputable given the evidence of record. The Court will thus assume that Plaintiff has satisfied the third element of his prima facie claim.

Returning to the first element of Plaintiff's prima facie case, the issue is whether Plaintiff engaged in protected conduct

18

as a public employee under the First Amendment. The first question is whether the speech touched on a matter of public concern.  The term "matter of public concern" refers to expression relating to any matter of political, social, or other concern to the community. *Anders v. Cuevas*, 984 F.3d 1166, 1176 (6th Cir. 2021) (quoting *Lucas v. Monroe Cnty.*, 203 F.3d 964, 973-74 (6th Cir. 2000)).  Allegations of corrupt practices by government officials are of the utmost public concern. *Id.* (quoting *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3rd Cir. 1989)). Indeed, it has been said the public interest in protecting speech is at its zenith when ensuring public organizations are being operated in accordance with the law. *Id.* (citing *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986)).

The Court next must determine whether Plaintiff spoke as a private citizen or as a public employee pursuant to his official duties. *Mayhew*, 856 F.3d at 462.  A plaintiff does not necessarily speak pursuant to his official duties just because his speech concerns a job-related matter.  *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("The First Amendment protects some expressions related to the speaker's job."). The law reflects the notion that "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer

itself has commissioned or created." *Id.* at 421-22. Generally, when a public employee is speaking or expressing himself as part of his job duties, the lesser degree of constitutional protection is appropriate. *See id.* at 422. So, the inquiry here is whether Plaintiff's speech was made pursuant to his duties as the HAC's executive director, or more as a concerned member of the public as a private citizen. *See id.* at 421-22.

Finally, the *Pickering* test balances the private speech interests of a public employee against the efficiency interests of the government employer. *See Pickering*, 391 U.S. at 568. This balancing considers whether the statement (a) impairs discipline by superiors or harmony among co-workers, (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or (d) undermines the mission of the employer. *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 539-40 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 2795 (2021) (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)) (quotations and brackets removed). The consideration of the employee's performance, impaired discipline by superiors, harmony among co-workers, and any undermining activity of the office's mission is focused on the effective functioning of the public employer's enterprise given "the manner, time, and place of the employee's

expression." *Id.* (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

The Sixth Circuit applied these principles in a similar case, *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891 (6th Cir. 2001). The plaintiff there was also an executive director of a Kentucky Housing Authority. Brandenburg brought a First Amendment retaliation claim after she was terminated, in part, for critical comments she made regarding newly elected Board members of the Housing Authority in Irvine, Kentucky

For background, Brandenburg was interviewed by a local journalist and asked about the demolition of one of the housing authority's complexes in Irvine. Brandenburg expressed criticism of the Board's decision to pursue demolition.

Brandenburg's speech, as characterized by the Sixth Circuit, was very similar to Plaintiff's here: (1) Brandenburg criticized the demolition project of Hickory Hills, a complex blighted like City Heights in this case, based on concerns that residents would be displaced, a purported concern of Plaintiff's; (2) Brandenburg protested that moving the management office to another location was a "waste of money," a substantial financial matter akin to Plaintiff's criticism of the Board's refusal to pursue certain grants; and (3) Brandenburg reported a Board member's perceived conflict of interest to officials in the HUD's Louisville office, similar to Plaintiff's reporting activities to the HUD in

21

Louisville regarding Meyer's alleged "conflict of interest" and non-compliance with KRS § 80.040. Brandenburg's conflict of interest accusation was a legal issue that had been definitively laid to rest by multiple legal authorities, just like Plaintiff's concern here about compliance with KRS § 80.040, and Brandenburg persisted in her challenge anyway, as did Plaintiff here.

The *Brandenburg* panel held for the Irvine Housing Authority on the efficiency-interest prong, observing that a great deal of deference must be given to the HAI's decision to terminate Brandenburg given the close confidential relationship an executive housing director has with the Board. *Id.* at 899. After Brandenburg made persistent public statements of criticism, on top of objective shortcomings in her job performance, the HAI Board's trust in Brandenburg was irreparably damaged, severely compromising the agency's proper and efficient operation. *See id.* at 899. The Court noted:

> Given the Board's reliance on the Executive Director to implement its directives and to provide continuing updates regarding the status of the properties, trust and a cooperative working relationship between the Board and Brandenburg were crucial elements in the performance of her duties. Damage to Brandenburg's relationship with the Board would have, predictably, inhibited the success of the HAI.

*Id.*

The Sixth Circuit observed that, although Brandenburg's speech touched upon matters that might be of concern to the public,

many other reasons existed to think the speech was simply self-interested expression of Brandenburg's disapproval of her employer. *Id.* at 898. Finding the efficiency element dispositive, the Court declined to rule on whether Brandenburg's speech regarded matters of public concern.   *Id.* at 898-98.

### 1. Plaintiff's statements and expression regarding Masters's Board appointment and the legitimacy of Meyer's election to Board-Chair under KRS § 80.040 were not constitutionally protected.

The first group of statements and expressions in question concern the lawfulness of Shawn Masters's appointment to the Board, Holt's participation in the Board-Chair election, and Meyer's assuming the title of Board Chair pursuant to the May 2018 Board election. Taking Plaintiff's speech at face value, Plaintiff and Allen were concerned that the Board and its Meyer-aligned members violated KRS § 80.040 by ignoring the party affiliation rule limiting Board membership to two members per political party.

To warrant constitutional protection, the speech must first be a matter of "public concern." Defendants argue that this speech concerned an "internal personnel dispute" particular to Rieck and Meyer and was thus not a matter of public concern. Plaintiff argues that the speech concerned, indeed it ensured, the lawful operation of a public agency, and thus was inherently a matter of public concern.

As discussed, *Brandenburg* took an agnostic stance as to whether very similar speech regarded matters of public concern, leaving this prong unresolved. *See Brandenburg*, 253 F.3d at 898-99. The Sixth Circuit did, however, acknowledge that speech regarding the lawful operation of a public agency is perhaps some of the most protected and valued speech under the First Amendment, and that taking Brandenburg's speech at face value, one *might* conclude her speech was a matter of public concern. *See id.* at 898 (quoting *Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986)).

Here, Plaintiff expressed his belief that Masters's Board appointment and Holt's participation in Meyer's election to Board Chair were unlawful under KRS § 80.040. Under these circumstances, it could reasonably be inferred that Plaintiff did not merely harbor philosophical reservations towards Meyer and his allies. Rather, Plaintiff may have felt he was ensuring a public organization, the HAC, was being operated in accordance with the law. That is typically the very situation in which the public interest in protecting speech is said to be "at its zenith." *Anders*, 984 F.3d at 1176. Thus, viewing the evidence in a light most favorable to Plaintiff, this speech regarded a matter of public concern.

The next question is whether Plaintiff's concerns about the lawful composition of the Board were made pursuant to his official duties as a public employee or whether he spoke as a concerned

private citizen. Plaintiff himself stated multiple times that this speech was pursuant to his position as executive director, that he was simply trying to ascertain who he was truly accountable to within the HAC given the defect he perceived under KRS § 80.040. Even if he felt some personal concern for the Board's lawful operation, he stated to the defendants and other HAC officials that his objection and reluctance about KRS § 80.040 was a matter of knowing to whom he was accountable between Allen and Meyer, finding Meyer's election dubious. His speech on this matter, therefore, was made as a public employee, not as a private citizen. Because of this alone, Plaintiff's speech addressing KRS § 80.040 was not constitutionally protected.

But even if Plaintiff had satisfied the foregoing element, the balancing of Plaintiff's liberty and government efficiency interests still favors the HAC under *Pickering*. To reiterate, the "pertinent considerations" for the balancing test are whether the statement (a) impairs discipline by superiors or harmony among co-workers, (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or (d) undermines the mission of the employer. *Bennett*, 977 F.3d at 539–40.

The record indicates that Plaintiff's speech and protest of the Board impaired discipline by superiors. Plaintiff's apparent refusal after April 2018 to meet or speak openly with Board members without Allen present prevented his accountability to the Board at a time it required transparency and cooperation of him more than ever, especially given the situation in the HAC's finance department.

Plaintiff's refusal to meet with Meyer and the Board while simultaneously making apparently unfounded legal accusations to outside departments and agencies also had a detrimental impact on his relationship with the Board and Meyer. It eventually became apparent that Plaintiff, much of the HAC staff, and Allen were firmly allied against Meyer and the rest of the Board, prompting a letter of protest against Meyer to be read by a HAC staff member to the Board during a board meeting. This surely fostered greater rivalry and decreasing transparency between the HAC employees and the very Board to which they were accountable.

Then, a clearer denial of loyalty can hardly be contemplated than when Plaintiff thereafter refused to recognize the legitimacy of a state court's order to observe the lawful membership of the Board. Both Plaintiff's and the HAC staff's disloyalty to the Board and to Meyer was clearly, perhaps permanently, placed into doubt by Plaintiff's refusal to observe the new Board's legitimacy. There

could be no reasonable expectation of restoring confidence between Plaintiff and the Board after that.

The divisions that formed between Plaintiff and the Board also interfered with the fulfillment of his job duties and with the regular operation of the HAC. Plaintiff was absent at meetings, without notice to Board members other than Allen, and neglected several agenda preparations for those meetings. He also took it upon himself not to renew McMurtry's contract, an obvious attempt to oust a Board employee who had not sided with him on multiple issues, in clear violation of the HAC's Procurement Policy requiring Board approval of contracts valued over $20,000.

Finally, as to whether this speech undermined the HAC's mission, one thing is clear from his own testimony: Plaintiff evidently regarded himself and Allen as the last bastion against changes the Meyer administration brought to public housing policy in Covington, changes they personally perceived as antithetical to the HAC's true mission. Plaintiff thus believed and acted as if it was he, not the Board, who understood and stood up for the true "mission" of the HAC.

The problem for Plaintiff is that it was never he, the executive director, that ultimately determined the "mission" of the agency. It was the Board alone who had that right, and Plaintiff had to have known this given the HAC bylaws and the opinion of every legal authority who considered the matter,

including a court of law. (*See* Doc. 76-34; *see also, e.g.*, Doc. 85,
Recordings, "MSJ RI 05-01-18 - HUD (01611697)"). Plaintiff thus
did not merely express a point of view different from the Board
while remaining otherwise cooperative with it, he attempted to
undermine the mission of the HAC as conceived by the Board, the
policymaking body within the HAC. Thus, this factor also favors
the government's efficiency interests.

With all four factors favoring the government under the
*Pickering* balancing test, the Court has two sound reasons to find
that Plaintiff's speech regarding alleged violations of
KRS § 80.040 was not constitutionally protected. It was not
protected speech because, even construing the facts most favorably
to Plaintiff, he did not engage in that speech as a private citizen
and because the *Pickering* balancing test favors the government
Defendants.

## 2. Plaintiff's statements regarding Meyer's and the Board's policies towards public housing in Covington were not constitutionally protected.

In the second group of speech and expression, Plaintiff
described Meyer's policy positions as, in his words, "illegal" and
"discriminatory" towards the HAC's residents. (Doc. 94, at 25-26).
Meyer's intention to cease filling units at City Heights was the
specific subject of these claims. Plaintiff also regarded Meyer's
policy positions and directives as "abuse of power," antithetical
to the Plaintiff's conception of HAC's "mission," as discussed,

and evidence of an unspecified "conflict of interest," presumably Meyer's decision not to pursue two grants to the HAC. Because these expressions can all be described as general criticisms of Meyer's and the Board's policy positions, the Court will analyze them together.

Again, the first requirement of Plaintiff's speech is that it regarded matters of public concern. *Mayhew*, 856 F.3d at 462. Defendants argue that Plaintiff's objections were fundamentally just criticisms of his employer's performance, something of no real concern to the public. (*See* Doc. 76-1, at 18). Plaintiff argues his policy-oriented speech touched on matters of public concern because it contained allegations of "discrimination," it regarded matters affecting many Covington residents, it pertained to major financial decisions affecting public housing, and it concerned Meyer's temperament and alleged "abuse of power." (*See* Doc. 94, at 24).

Taking the statements at face value, Plaintiff's speech would seem to address matters of public concern. Plaintiff made vague allegations against Meyer of "potential for discrimination," and reports of discrimination are typically matters of broader public concern. *See Matulin v. Vill. of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988). Plaintiff's claim that Meyer and his policies "discriminated" against HAC residents, though disguised or asserted as a claim of discrimination, is fundamentally

Plaintiff's criticism of Meyer's decision not to invest further in City Heights. Regardless of whether the policy was motivated by some unsubstantiated discriminatory animus, it still affects many members of the public and was the subject of debate by the Board. (Doc. 94, at 28). Policies affecting the future of public housing in Covington affect hundreds of constituents and concerns decisions regarding the use of substantial public resources. *See Brandenburg*, 253 F.3d at 898. So whether Plaintiff alleged some unspecified discrimination or was just airing a more general grievance concerning a new housing policy, Plaintiff's speech was of public concern.

However, the impact this speech had on close working relationships and on the fulfillment of his duties again favors defendants. Under circumstances very similar to those in *Brandenburg*, Plaintiff Rieck had seriously, irreparably, and, in the end, unjustifiably breached the Board's trust by continually criticizing the Board's policy positions and decision-making authority by majority rule. Plaintiff displayed his lack of loyalty to the Board and to its members, and it was apparent to all present, and apparent from the record, that Plaintiff's disloyalty was rooted in his own policy preferences. So, consistent with *Brandenburg*, given the degree of confidence required by similarly situated housing directors, the HAC's and public's interest in

continued government efficiency and accountability outweighed Plaintiff's liberty interests in continually expressing his views.

Finally, even if there were a question as to the foregoing *Pickering* balancing, Defendants again prevail on the issue of whether Plaintiff spoke on these matters as a private citizen or as a public employee pursuant to his duties. Defendants argue that Plaintiff engaged in his policy-oriented speech as a public employee pursuant to his official duties because he expressed his views only during HAC Board meetings, to Board members and City officials, and within internal emails, particularly between him and Allen. (Doc. 76-1 at 20). Plaintiff, of course, argues he expressed his views on these policy matters "beyond the [internal] chain of command" as a private citizen, that he expressed himself in Board meetings attended by members of the public, and reported alleged impropriety to Covington city officials and HUD officials. (Doc. 94 at 25).

As Defendants correctly point out, Plaintiff addressed his policy concerns from the position of an advisor, albeit as a critical advisor, and he spoke from a position of informed authority as the executive director of HAC, not as an ordinary private citizen stating a complaint to a government official. Plaintiff admits this at least three times. (Doc. 78, Rieck Dep. at 43 ("Q: Did you attend these board meetings in your role as -- did you attend the HAC board meetings in your role as executive

director? A: Yes, I did."); 44 (describing the "Executive Director's Minute" at Board meetings as "intended to be an opportunity for the executive director to report on whatever they chose."); 44 ("Q: And you'd be reporting and speaking in your role as executive director about issues relating to the agency during that executive director report, correct? A: Correct.")).

While Plaintiff reported what he perceived to be improprieties within the HAC to outside city officials and the HUD, those concerns fundamentally pertained to a dispute over organizational procedure, and Plaintiff—as the executive director—was tasked with properly carrying out and facilitating the HAC and board affairs. (Doc. 76-2, HAC Bylaws, at 2-3). Similarly, in that capacity he advocated for the Board to pursue two different public grants. Though they were not ultimately obtained, Plaintiff considered that nearly obtaining them was among his professional accomplishments as a public official. (*See* Doc. 76-43, 2/15/18 Rieck Email).

Therefore, none of Plaintiff's speech was constitutionally protected because he spoke from his position as a public employee, and because his liberty interests were outweighed by the government's efficiency interests.

## C. Breach of Contract

The final claim subject to this motion for summary judgment is Plaintiff's breach of contract claim. When there is conflicting

evidence, the issue of whether a contract was breached and by whom is typically a question of fact for the jury. *Schmidt v. Schmidt*, 343 S.W.2d 817, 819 (Ky. 1961). In considering a motion for summary judgment, the key issue is whether Plaintiff has provided sufficient evidence as a matter of law to prove Defendants breached the employment contract between them.

Defendants argue Plaintiff was fired "for cause" as the contract allowed, namely his "failure to perform the duties of executive director in a manner satisfactory to the Board" and "insubordination and deliberate refusal to follow the instructions of the Board." Plaintiff argues Defendants' reasons for terminating him are pretextual, and thus his termination violated the employment contract.

Defendants point to specific bases for terminating Plaintiff's contract:

a) Plaintiff failed to place on the April 18, 2018 Board meeting agenda a crucial Board Chair election, and then failed to conduct it;

b) Plaintiff failed to prepare minutes accurately reflecting what happened at the May 16, 2018 and May 23, 2018 Board meetings, with an apparently intentional omission of key matters unfavorable to the ousted Board Chair, Allen;

c) Plaintiff failed to attend, without notice to the Board in general, Board meetings on May 16, 2018 and June 20, 2018, notifying only Allen of his use of sick leave and annual leave respectively;

d) Plaintiff refused Board Chair Meyer's request to meet with him to discuss the operating budget for the upcoming fiscal year starting on July 1 unless Allen was present;

e) Plaintiff persistently refused to acknowledge or respect the Board counsel's legal opinions and advice that he respect the new Board, forcing the Board to take legal action to compel Plaintiff's compliance with Board directives;

f) In violation of the HAC's Procurement Policy, Plaintiff decided unilaterally without Board authorization not to renew Board counsel's contract for legal services;

g) BDO/finance department staffing issues persisted under Plaintiff's leadership, costing the organization at least $55,000 more than the Board approved by contract, then Plaintiff failed to timely disclose the contract amount shortfall to the Board;

h) Plaintiff lacked attention to detail, namely he allowed housing choice vouchers to expire and remain expired for a year and failed to filed annual reports for HAC-

affiliated agencies to the secretary of state, causing them to administratively expire; and

i) Plaintiff failed to place three items on the agenda for the July 18, 2018 Board meeting, two of which were important budget-related items.

(Doc. 76-1, at 38-50).

Plaintiff argues the above reasons for termination are either false or exaggerated, and thus pretextual. Corresponding to each item above, Plaintiff argues:

a) The Board election was delayed because Meyer actually requested it be moved from April 18, 2018, and then Meyer had McMurtry preside over the election instead, (Doc. 94, n. 22);

b) The May 16, 2018 minutes were accurate and remained unchanged, and the incongruity in the May 23, 2018 minutes existed because of the "unusual manner that led to debate and disagreement among Board members about whether the meeting could have continued after Chair Allen's departure," as Plaintiff fundamentally saw Meyer's election to Board Chair as unlawful under KRS § 80.040, explaining his omission from the minutes, (*see* Doc. 94, at 41);

c) Plaintiff denies he failed to provide notice to the Board of his absences at the May 16, 2018 and the June 20,

2018 Board meetings because he felt his notice to Allen was sufficient, though she was no longer Board Chair, (*id.* at 42);

d) Plaintiff excuses his refusal to meet alone with Meyer as reasonable given his view that Meyer's election to HAC Board Chair was unlawful, despite mounting legal authority to the contrary;

e) Plaintiff denies forcing the Board to take legal action, he simply believed the disagreement somehow "should have been resolved internally by the Board members," (Doc. 78, at 885-86);

f) Plaintiff denies without evidence that he did not violate the HAC procurement policy by issuing an RFP for legal services, even though the contract amount was over the procurement policy's $20,000 limit;

g) Plaintiff admits he was admonished for handling the BDO/finance department issue but argues he is less responsible because "the Board itself acknowledged its role in lacking oversight over the matter," (Doc. 76-26), arguing that Meyer was simply unhappy with the amount of money spent on BDO despite Plaintiff's various efforts to address the staffing issues in the finance department;

h) Plaintiff admits the housing vouchers had expired under his watch, but disputes the "extreme risk of financial failure," claiming that no action was truly required for the HAC to renew the vouchers and that, in any case, it was the fault of a subordinate staff member who failed to give notice of renewal, (Doc. 78, at 210);

i) Plaintiff minimizes his allowing the administrative dissolution of HAC-affiliated entities as a minor, technical oversight that cost only $15 to correct, (Doc. 95, Arlinghaus Dep., at 57-58);

j) Plaintiff excuses his failure to schedule a Budget Committee meeting and to ready a report for the July 18, 2018 Board Meeting by pointing out that he was terminated the day before the board meeting, (Doc. 94, at 46);

k) Plaintiff does not dispute that he failed to create a report to the Board on "the structure of the Housing Authority, including its relationships and interests with other corporations" for the July 18, 2018 board meeting, only that there is no record evidence he was asked to "make the requested report" on NIP specifically (one such corporate affiliate), claiming he was ready to make the requested report during his "Executive Director" time, having already "collected materials" for the report, (Doc. 94 at 47); and, finally,

l) Plaintiff claims he did not, despite Defendants' suggestion, fail to include a budget resolution on the July 18, 2018 agenda, and that in fact the resolution was addressed and passed at the July 18, 2018 board meeting. Given these circumstances, Plaintiff argues a jury could find for him on the contract claim.

This evidence is incapable of supporting a verdict that Plaintiff was fired without cause. In particular, the issues in the finance department alone constitute cause for termination. Plaintiff does not deny the HAC incurred significant expense in outsourcing the HAC's finance department under the BDO contract. He simply minimizes the seriousness of the problem and denies fault for it happening under his leadership. Moreover, Plaintiff failed to fulfill multiple duties to the Board, which Plaintiff attempts to excuse by claiming there was a dispute as to who was truly Board Chair after the spring election, or by blaming subordinate employees. Neither circumstance is an excuse given the unanimous legal opinions in the Board's favor, and because Plaintiff was ultimately responsible for his subordinates' work product, or lack thereof. (76-2, HAC Bylaws, at 2 ("The Secretary/Executive Director . . . shall have general supervision over the administration of its business and affairs, subject to the direction of the Board. He/she shall be charged with the management of the housing projects of the Authority.")).

Otherwise, Plaintiff simply minimizes the errors defendants cite as either unimportant or easily cured, like the housing voucher expiration and the administrative dissolution of HAC's corporate affiliates. The Court need not opine as to how "serious" these oversights were. Plaintiff admits that these things happened under his watch and does not, in most cases, even dispute his responsibility.

Finally, because so many of these issues stemmed from Plaintiff's persistent obstinance and hostility toward Meyer and the Board, and consistent with the finding that Plaintiff's speech was not constitutionally protected, the speech itself may be regarded as cause to fire Plaintiff. *See Brandenburg*, 253 F.3d at 899.

For the foregoing reasons, Defendant has demonstrated that no genuine issue of fact exists to preclude summary judgment as to Plaintiff's breach of contract claim.

**D. Qualified Immunity**

The Court declines to reach the issue of whether any of the individual defendants qualify for immunity to suit, because Plaintiff's claims fail on the foregoing substantive grounds. *Heggen v. Lee*, 284 F.3d 675, 679 (6th Cir. 2002) (settling the substance of the Section 1983 claim before reaching qualified immunity determinations). The immunity issue is thus moot, because no constitutional violation occurred. *Norton v. Stille*, 526 F.

App'x 509, 512 (6th Cir. 2013) (qualified immunity requires both a violation of a constitutional right under the totality of the circumstances and that such constitutional right be clearly established). Similarly, although neither party argued the immunity issue as to Plaintiff's breach of contract claim under state law, the immunity issue would be moot as to that claim, because there is no genuine dispute of material fact that the defendants did not breach the employment contract.

Therefore, having reviewed this matter, and being otherwise advised,

**IT IS ORDERED** that Defendants' motion for summary judgment, (Doc. 76), is **GRANTED**. A separate judgment shall enter concurrently herewith.

This 11th day of August 2021.



**Signed By:**

**_William O. Bertelsman_** *WOB*

**United States District Judge**